GARDA

Contract: 260-202401

## ARMORED CAR SERVICE AGREEMENT

This Agreement is made on March 1, 2013 by and between Garda CL Southeast, Inc. (Hereinafter called "CARRIER") and Plaquemine Bank and Trust whose address is PO Box 626, Plaquemine, LA 70765 (Hereinafter called "CUSTOMER").

### SECTION I: BASIC AGREEMENT

The Parties both agree as follows:

1. Service: CARRIER agrees to render Services to CUSTOMER at the locations, times, prices, frequencies and liability limits set forth on Schedule A attached hereto and made a part hereof and upon such other terms and conditions as are set forth on Schedule A.

2. Insurance: During the Term of this Agreement, CARRIER shall maintain the insurance in the amounts and types set forth herein.

3. Maximum Liability: The Maximum Shipment Liability shall be as set forth on Schedule A hereof.

4. Term: The Term for Services under this Agreement shall be as set forth on Schedule A.

5. Payment for Services: CUSTOMER agrees to pay CARRIER for the Services, the sum set forth on Schedule A per month, plus all additional charges associated with special Service requests and any applicable surcharges pursuant to Schedule A.

6. Entire Agreement: This agreement includes the terms hereof, and the terms of service contained in Schedule A.

### SECTION II. DEFINITIONS.

(a) The word "Holiday" as used in this Agreement shall mean the days designated on Schedule A. Holiday Service will be provided at the prices set forth on Schedule A.

(b) The word "Property" shall mean currency, coins, precious metals, checks, notes, bonds, negotiable instruments, securities and all other things of value but excluding hazardous materials or materials for which transport is legally prohibited or restricted by applicable State or Federal Law.

(c) The word "Sealed" as used in this Agreement shall mean closed in a manner that is reasonably designed to prevent easy access to the Property and that under normal circumstances would tend to reveal evidence of tampering or manipulation if unauthorized access were attempted.

(d) The word "Service" shall mean to call for Sealed Shipments said to contain Property, to receipt therefore, and to deliver the same in like condition to a designated consignee, and to perform any other Services set forth on Schedule A.

(e) The word "Shipment" as used herein shall mean the total Property in Sealed containers received by CARRIER at a single location from a single consignor for delivery to one other location to a single consignee.

(f) The words "Reconstruct", "Reconstructed" and "Reconstruction" shall mean to identify checks only to the extent of determining the face amount of said checks and the identity of the maker and/or check numbers, account numbers, routing numbers, financial institution, and the identity of the maker and the endorser of each.

### SECTION III. SERVICE.

(a) Service. CARRIER agrees to render Service to CUSTOMER at the locations, prices, frequencies and liability limits set forth in Schedule A attached hereto and made a part hereof and upon such other terms and conditions as are set forth on Schedule A.

(b) Non-deliverables: When delivery of a Shipment cannot be made for any reason, CARRIER shall notify CUSTOMER and return the Shipment to CUSTOMER or to CARRIER'S vault for storage. Notification of such return shall be promptly given to CUSTOMER.



EXHIBIT "A"

GARDA

(c) Premise Time: CUSTOMER understands that time is of the essence to CARRIER'S business, therefore, CUSTOMER agrees that CARRIER'S messenger shall be present no more than a maximum of ten (10) minutes to make a pickup and/or delivery of Property. If said premise time exceeds the time stated herein, it is agreed that the messenger may leave and that such departure shall not be a breach of this Agreement. CUSTOMER may call and request that a Service call be made by CARRIER subsequent to such departure. By requesting same, CUSTOMER agrees to pay for said additional Service call at a rate to be established by mutual agreement, such charges to be in addition to regular Service charges.

(d) EvenXchange® Service: CARRIER agrees to accept change orders directly from CUSTOMER location(s) via CARRIER'S telephone order entry system, and CARRIER will prepare and package each order from the inventory ("Inventory") of coin and currency (hereafter, collectively "Cash") maintained at CARRIER'S facility(ies). Subject to the terms herein and in the Agreement, CARRIER shall deliver change orders in accordance with the scheduled pickup/delivery dates set forth in the attached Schedule A. Change orders requested by CUSTOMER for delivery on days other than scheduled pickup/delivery dates shall be subject to CARRIER approval and such special charges as provided in the Agreement, or as otherwise mutually agreed upon. All change orders must be placed before 11:00 a.m. on the day prior to a requested/scheduled delivery. Saturday, Sunday and Monday orders must be placed before the above-referenced time on Friday. CUSTOMER shall not order any currency in denominations exceeding Ten Dollar ($10.00) notes.

(e) Payment for Services: CUSTOMER agrees to pay CARRIER for the Services at the prices set forth in the attached Schedule A, in the event CUSTOMER uses the Even Exchange Service. (The first such usage indicates agreement with the rates as set forth on Schedule A), plus all additional charges associated with special Service requests, as requested by CUSTOMER. Payment is due net thirty (30) days from the date of any invoice.

SECTION IV. INSURANCE.

(a) All Risk Insurance: CARRIER agrees at all times during the life of this Agreement to purchase and maintain insurance with a responsible insurance company to cover the loss or destruction of Property handled or protected by CARRIER, its agents or employees, on behalf of CUSTOMER pursuant to this Agreement. CARRIER agrees to furnish CUSTOMER with written evidence of compliance with this provision. It is understood and agreed that CARRIER shall not be liable in any capacity for loss or harm to CUSTOMER'S Property or for damages directly and/or proximately flowing from loss or harm to CUSTOMER'S Property while said Property is in the possession of CARRIER, nor shall CARRIER'S insurance carrier be required to cover such damages when same are caused by any of the following:

1. Hostile or warlike action in time of peace or war, including but not limited to, action which hinders, combats or defends against an actual, impending or expected attack by any government or sovereign power (de jure or de facto), or by any authority maintaining or using military, naval or air forces, or by military naval or air forces, or by an agent of any government power, authority or force;

2. Any weapon of war employing atomic fission or radioactive force whether in time of peace or war;

3. Any accident or catastrophe occurring at a government or private facility employing the use of atomic fission or radioactive energy whether in time of peace or war;

4. Insurrection, rebellion, revolution, civil war, usurped power, or action taken by government authority in hindering, combating, or defending against such an occurrence, seizure or destruction under quarantine or customs regulations, confiscation by order of any government or public authority, or risks of contraband or illegal transport or trade.

(b) Other Insurance: CARRIER shall maintain during the performance of the Services the following insurance.

(i) Worker's Compensation and Employers' Liability Insurance as prescribed by applicable law.

(ii) Comprehensive or Commercial General Liability Insurance (bodily injury and property damage), the limits of liability of such insurance shall not be less than $ 1,000,000 combined single limit per occurrence.

(iii) Automobile Bodily Injury and Property Damage Liability Insurance, covering owned, non-owned and hired automobiles, the limits of which shall not be less than $ 1,000,000 combined single limit per occurrence.

GARDA

**SECTION V. CUSTOMER INDEMNITY**

(a) Indemnity: CARRIER agrees to defend, indemnify and hold harmless CUSTOMER from all claims, demands, actions and causes of action for damage or injury, including death, that are hereafter made or brought against CUSTOMER by any third party for the recovery of actual damages to the extent caused by reason of the negligence or willful misconduct of CARRIER, its employees or agents. CARRIER shall have no defense or indemnification obligation to CUSTOMER to the extent such damage or injury is caused by the negligence or willful misconduct of CUSTOMER, its employees or agents. In no case shall CARRIER be liable for or owe any duty of indemnification with respect to any exemplary, punitive or consequential damage claims by CUSTOMER or any third party arising from the loss or destruction of Property. CARRIER'S obligation with respect to any claim for damages by CUSTOMER or any third party with respect to any Property shall not exceed the Maximum Shipment Liability.

**SECTION VI. CARRIER LIABILITY**

(a) Maximum Shipment Liability: Except as provided above, it is understood and agreed that CARRIER and its insurance company will be liable for loss of or damage to CUSTOMER Property inclusive of Reconstructive damage up to the maximum sum for each Shipment as set forth in Schedule A, which sum is the agreed maximum value of any single Shipment ("Maximum Shipment Liability"). The Service and liability obligations assumed by CARRIER and the rates charged by CARRIER are based, in part, upon the values of Shipments as declared herein by CUSTOMER, for the safe delivery or return of any Shipment of CUSTOMER'S in the possession of CARRIER, or in the possession of the agents or employees of CARRIER pursuant to the terms of this Agreement. It is therefore expressly agreed by the CUSTOMER that the provisions of this Agreement dealing with Maximum Shipment Liability to be accepted by CARRIER from the CUSTOMER for delivery to consignee, or from consignee, may not be waived or amended by any agent of CARRIER, but that such waiver or amendment may be made only with the written consent of an officer of CARRIER. CARRIER will not be liable for loss or damage to Property consigned to it in excess of the Maximum Shipment Liability unless CUSTOMER has paid all excess liability charges to the CARRIER for all Shipments of Property with a value in excess of the Maximum Shipment Liability amount.

(b) Force Majeure: CARRIER shall not be in breach of this contract nor be liable in any capacity for damages, including but not limited to loss of interest, directly and/or proximately flowing from any delay in or failure to make pickups or deliveries on CUSTOMER'S behalf pursuant to the terms of this Agreement due to causes beyond CARRIER's reasonable control, including strikes, work stoppages, lockouts, epidemics, pestilence, strikes by CUSTOMER or consignee's employees, work stoppages by CUSTOMER or consignee's employees, lockouts by CUSTOMER or consignee, war, rebellion, insurrection, hostilities, legal process, court action, mechanical failure, accidents, fires, acts of God, storms, flood, closed transportation routes or other causes beyond CARRIER'S reasonable control. It is understood and agreed that CARRIER is not a guarantor of any pickup or delivery times that may be established from time to time by custom, practice or agreement. Any such times are mere approximations or estimates, however, CARRIER agrees to use reasonable efforts to accommodate pickup and delivery times requested by CUSTOMER and agreed to by CARRIER.

**SECTION VII. PROCEDURES.**

(a) Authorized Messengers: CARRIER agrees to furnish CUSTOMER the CARRIER's secure Authorized Agent Card procedure to conduct deposit pickup and change order delivery. CUSTOMER may rely upon the Authorized Agent Card as evidence of authority of the messenger. CARRIER assumes no liability for Property delivered to any employee or other person, except those who display an Authorized Agent Card and arrive in full uniform.

(b) Shipment Requirements: CUSTOMER agrees to cause all Shipments to be made by means of CUSTOMER placing CUSTOMER'S Property in Sealed packages or containers, of a mutually agreed upon type and design, which clearly and distinctly indicates the name and address of the consignor as well as the name and address of the consignee. CUSTOMER further agrees to clearly and distinctly set forth the value of each Shipment on the outside of the Sealed packages or container. CUSTOMER agrees that CARRIER, its agents or employees, shall have the right to refuse to pickup Shipments of Property which are not Sealed and properly marked by CUSTOMER as set forth above and that CARRIER assumes no liability for any damages or loss which may result as a consequence of such refusal to make a pickup. CUSTOMER further agrees that CARRIER shall not be liable for any mysterious disappearance of, shortage or damage to the contents of any Shipment unless the Shipment was properly Sealed at the time of delivery to CARRIER and shows evidence of tampering at the time CARRIER delivers said package to the consignee and the consignee immediately notes, in writing, the evidence of tampering on CARRIER'S receipt document. Absent notation on CARRIER'S receipt document by the consignee at the time of receipt, the burden of proof shall be on the CUSTOMER to show the CARRIER is responsible for such loss or claim related to a Sealed container said to contain Property. The parties agree that, while CUSTOMER may keep its own receipt and log book for its own internal purposes, CARRIER's receipt document shall be deemed the sole controlling document with respect to all Services rendered, including, without limitation, deposits delivered and received, timing, losses, shortages, overages, investigations, claims or litigation.

GARDA

(c) Duration of Shipment Liability: CARRIER'S possession of CUSTOMER'S Shipment begins only after an authorized messenger employed by CARRIER signs a receipt for and receives said Shipment into his/her physical custody, thereafter CARRIER'S possession of CUSTOMER'S Property terminates when and as an agent or consignee designated by CUSTOMER receives physical custody (i.e. physical possession or control) of the Shipment. It is understood and agreed that CARRIER'S liability for the handling or protection of CUSTOMER'S Property arises and exists solely and concurrently with CARRIER'S possession thereof.

(d) Consequential Damages: It is understood and agreed that under no circumstances or theory of liability shall CARRIER and/or CARRIER'S insurance company be liable for any incidental or consequential damages to CUSTOMER or any third party directly or on behalf of CUSTOMER resulting from or occasioned by the loss of or damage to any Shipment of Property delivered to CARRIER pursuant to this Agreement.

(e) Claims: It is understood and agreed that under no circumstances shall CARRIER and/or CARRIER'S insurance company be liable or responsible for any claim for loss of or damages to CUSTOMER'S Property which is not submitted in writing to the CARRIER within the greater of ninety (90) days after the date that said loss or damage purportedly occurred or the minimum notice requirement under the law of the jurisdiction where the Service took place. Within thirty (30) days after the giving of written notice of a claim of loss or damage, CUSTOMER agrees to furnish CARRIER a detailed written statement of the circumstances surrounding such loss or damages as well as detailed written proof of such loss or damages in form reasonably satisfactory to CARRIER, which proof of loss shall be substantiated by the books, records and accounts of CUSTOMER and shall be subscribed and sworn to by CUSTOMER or its duly authorized officer. Failure of CUSTOMER to comply with the foregoing shall relieve and release CARRIER of any liability to CUSTOMER with respect to such claimed loss or damage.

(f) Checks. CUSTOMER shall maintain an accurate record of all checks placed in any Shipment given to CARRIER and in the event of a loss, CUSTOMER agrees to promptly, diligently and completely cooperate with CARRIER in the Reconstruction and replacement of lost, destroyed or stolen checks which had been contained in any such Shipment. CARRIER'S sole liability shall be the payment to CUSTOMER of: (i) reasonable costs necessary to Reconstruct the checks plus any necessary costs because of stop payment procedures; (ii) the face value of checks that cannot be Reconstructed, provided adequate proof of the value thereof is presented to CARRIER, except those checks which would not be collectable at the time of loss, but not to exceed the limit of $5,000.00 per Shipment for the unidentified checks. The maximum liability of CARRIER for the checks shall in no event exceed the Maximum Shipment Liability limit set forth in Schedule A which includes the aforesaid $5,000.00 for the unidentified checks. Complete cooperation shall include but not be limited to, recovery of hard copy or electronic records of checks including, without limitation, point of sale information created by its employees, agents or customers; as well as, requests by CUSTOMER to makers of the missing checks to issue duplicates and in the event the makers refuse to do so, then to assert all of its legal and equitable rights against said makers. CUSTOMER agrees that CARRIER and CARRIER'S insurance company shall not be liable for damages directly or proximately flowing from CUSTOMER'S breach of this provision. Upon payment of a loss pursuant to this Agreement, CARRIER or its insurance company shall be subrogated to all CUSTOMER'S rights and remedies of recovery therefore. The CUSTOMER shall assign to the CARRIER, CUSTOMER'S right to receive payment under any check(s) for which CARRIER has reimbursed CUSTOMER and CUSTOMER shall execute any document necessary or reasonably desirable to perfect and accomplish such assignment.

(g) Even Exchange Procedures: The parties agree that CUSTOMER shall procure an inventory of Cash which shall be maintained at CARRIER'S facilities in amounts by denomination to fulfill the change order requirements as set forth hereunder. CARRIER shall deliver CUSTOMER change orders, subject to the terms herein and in the Agreement, to CUSTOMER store locations and CUSTOMER store locations shall contemporaneously provide CARRIER'S messenger with a currency deposit, in the Sealed, tamper-resistant bag provided by CARRIER, in an aggregate amount equal to the face amount of the change order. CARRIER shall have no obligation to provide CUSTOMER with a change order unless CUSTOMER strictly complies with the foregoing currency exchange obligations. CARRIER agrees to reimburse CUSTOMER on a weekly basis for any amount in the currency deposit that is in excess of the amount of the change order delivered to the CUSTOMER's store. CUSTOMER agrees to reimburse CARRIER on a weekly basis for any amount that is less than the amount of the change order delivered to the CUSTOMER's store. Absent evidence of CARRIER tampering, CUSTOMER will be responsible for differences found by CARRIER during CARRIER'S verification of any CUSTOMER change order currency exchanges.

SECTION VIII. GENERAL.

(a) Payment for Services: CUSTOMER agrees to pay CARRIER for the Services, the sum set forth on Schedule A per month, plus all additional charges associated with special Service requests. Payment is due net 30 days from the date of any invoice. CUSTOMER understands and agrees that CARRIER reserves the right to charge the lesser of 1.5 percent or the highest rate permitted by applicable law, per month or fraction thereof, finance charge on all balances that are not paid within 30 days of the date of invoice. CUSTOMER further understands and agrees that CARRIER shall not be responsible to issue credits for

GARDA

erroneous billings that are more than ninety (90) days old as of the date the credit is requested. The prices quoted on Schedule A do not include state sales and transportation related taxes, local sales and transportation-related taxes or federal sales and transportation related taxes.

(b) Cost Increases: CARRIER reserves the right to adjust the fees for Services set forth hereunder on Schedule A at any time after the first year of the Agreement upon thirty (30) days advance written notice. CARRIER shall have the right to charge a surcharge for fuel or insurance cost increases, as applicable upon thirty (30) days initial advance notice.

(c) Integration, etc.: This Agreement shall become effective only when approved and signed by authorized representatives of the parties hereto. This Agreement, including all attachments, schedules and exhibits constitutes the entire agreement and understanding between the parties related to the subject matter hereof, and no representations, inducements, promises or agreements not embodied herein shall be of any force and effect. This Agreement shall be binding in accordance with its terms upon the parties hereto and their respective transferees, assigns and successors in interest; provided, however, this Agreement may be assigned by CARRIER to any parent, subsidiary, or affiliated corporation which it may hereafter acquire or with which it may be merged or consolidated, or to any corporation acquiring the business and assets of CARRIER, but this Agreement shall not be otherwise assigned by either party hereto without the prior express written consent of the other party, which consent shall not be unreasonably withheld. This Agreement may be altered, amended, or superseded solely by means of a writing signed by the parties hereto. The headings hereof are for convenience only and have no bearing on the interpretation of the terms of the Agreement.

(d) Jurisdiction. The parties agree that the terms of this Agreement shall be governed by and construed in accordance with the laws of the State of California.

(e) Change in Conditions. CARRIER may increase the charges set forth in Schedule A upon written notice to CUSTOMER in the event of a change in economic conditions beyond CARRIER's reasonable control that increases the operating costs incurred by CARRIER.

(f) Termination for Breach. Either party may terminate this Agreement in the event of a material breach of this Agreement as follows: The non-breaching party shall give the breaching party a written notice specifying the alleged breach and thirty (30) days to cure the breach. If the breach in not cured within said time, the non breaching party may terminate the contract effect the next day by giving a written notice of termination.

(g) Confidentiality. The parties as part of the performances hereunder, during the Term of this Agreement, will have access to and become acquainted with various trade secrets including, without limitation, processes, programs, systems, software, compilations of information, records, specifications, financial information, marketing plans and customer lists which are owned by a party and which are regularly used in the operation of the business of a party ("Confidential Information") and data belong to clients of CUSTOMER, including non-public consumer information. Neither party shall disclose any of the aforesaid Confidential Information, directly or indirectly, or use them in any way either during the Term of this Agreement or at any time thereafter, except as required in the course of its Services under this Agreement. All Confidential Information shall remain the exclusive property of the disclosing party or its customers and clients and shall not used or reproduced except in the sole interest of the disclosing party and with its prior consent and shall be immediately returned or destroyed upon request of the disclosing party or at the termination of Services hereunder.

IN WITNESS WHEREOF, the parties hereto intending to be bound have caused this Agreement to be executed, as of the date first written above, by their duly authorized representatives.

| Carrier | Customer |
| --- | --- |
| Garda CL Southeast, Inc. | Plaquemine Bank and Trust |
| By: *[signature]* (Signature) | By: *Rhett Vaughn* (Signature) |
| David Rugani (Printed Name) | *Rhett Vaughn* (Printed Name) |
| Title: Controller | Title: *VP of Operations* |

GARDA

## Schedule A

| FOR OFFICE USE ONLY | |
|---|---|
| Customer Account: Plaquemine Bank and Trust | Contract: 260-202401 |

Garda CL Southeast, Inc. ("CARRIER") and Plaquemine Bank and Trust ("CUSTOMER") agree that effective March 7, 2013, this Schedule A amends and is incorporated into the Armored Car Service Agreement between the parties (the "Agreement") dated as of March 1, 2013 (the "Contract Date") by adding or amending the following Customer rates, schedules, lists, liabilities, days, Term and/or terms.

(I) Term

The Agreement shall be in full force and effect from March 1, 2013 until March 1, 2016 and shall automatically renew thereafter from year to year until cancelled by either party by giving the other party written notice thereof ninety (90) days in advance of each anniversary of the Contract Date.

The rates contained in this Schedule A shall remain the same for the first year of the initial term of the Agreement. Upon entering years two and three, a two percent (2%) increase will be applied each year.

(II) Holidays

CUSTOMER acknowledges that CARRIER observes the following Holidays for which a Holiday Service rate as set forth in Section III below shall apply.

(1) New Years Day
(2) Martin Luther King Day
(3) Presidents Day
(4) Easter
(5) Memorial Day
(6) Independence Day
(7) Labor Day
(8)Columbus Day
(9) Veteran's Day
(10) Thanksgiving Day
(11) Christmas Day
(12) Family Day (NV Only)
(13) Admission Day (NV Only)
(14) Pioneer Day (UT Only)

It is understood and agreed that when a Holiday falls on a Sunday the following Monday shall constitute the Holiday; when a Holiday falls on a Saturday the preceding Friday, that Saturday, or the following Monday shall constitute the Holiday.

(III) Service Location(s) and Service Detail(s)

| Status | **Effective Date | **Service Location | **Address | City | State | **Product | **Monthly Price | Item Allowance | Liability Limit |
|---|---|---|---|---|---|---|---|---|---|
| Active | 1/1/2013 | Plaquemine Bank | 24025 Eden St | Plaquemine | LA | Armored Transportation On-Call Service | $0.00 | | $9,999,999.00 |

(** Flagged for GARDA CL Internal purposes only.)

The following rate schedule applies to the service locations listed above:

| **Product | | |
|---|---|---|
| Armored Transportation On-Call Service | | |
| Description | Price ($) | Unit of Measure |
| Input: Maximum Shipment Liability ($) | 9999999 | Dollar |
| ARMORED CAR REG TRIP $ | 50 | Trip |
| E-Cash Same Day Delivery | 150 | Trip |
| EXCESS LIABILITY ($000's) $ | 0.25 | per $000's |
| EXCESS ITEMS $ | 1 | Unit |
| EXCESS PREMISE TIME $ | 10 | Minute |

(** Flagged for GARDA CL Internal purposes only.)

* [N] By placing a "Y" in this box, CUSTOMER agrees and confirms that it captures such information as it deems necessary to fully Reconstruct all checks in each Shipment. Accordingly, the CUSTOMER, subject to Section VII(f) of the Agreement, declines any coverage by and waives any liability against the CARRIER above the amount set forth in the Maximum Shipment Liability Checks, in exchange for not being assessed any excess liability charges for checks included in any shipment above the Maximum Shipment Liability Checks amount. Otherwise, by placing an "N" in this box, the terms of Sections VI(a) & VII(f), will apply and additional and excess liability charges will be assessed for amounts in excess of the Maximum Shipment Liability Checks.

GARDA

(IV) Days of Service

| **Service Location | City | State | Sunday | Monday | Tuesday | Wednesday | Thursday | Friday | Saturday |
|---|---|---|---|---|---|---|---|---|---|
| Plaquemine Bank | Plaquemine | LA | N | N | N | N | Y | N | N |

(**Flagged for GARDA CL internal purposes only.)

## Custom Fuel Surcharge Index and Methodology

Our fuel surcharge calculation method is based on the 3 week rolling average of the U. S. Energy Information Administration (eia.doe.gov). The Department of Energy website is updated every Tuesday and the National average is the benchmark used.

Each month, the 3-week rolling average will be recalculated and the surcharge will be adjusted up or down based on the following matrix:

For any 3-week U.S. National Average Diesel Fuel price over $3.50 add an additional 1% for every $0.25 per gallon increase.

| Per Gallon Price | Surcharge |
|---|---|
| Below- $3.50 | 0% |
| $3.501-$3.75 | 1% |
| $3.751-$4.00 | 2% |
| $4.001-$4.25 | 3% |
| $4.251-$4.50 | 4% |
| $4.501-$4.75 | 5% |
| $4.751-$5.00 | 6% |

**Carrier**

Garda CL Southeast, Inc.

By: [signature]
(Signature)

David Rugani
(Printed Name)

Title: Controller

**Customer**

Plaquemine Bank and Trust

By: [signature]
(Signature)

Rhett Vaughn
(Printed Name)

Title: VP of Operations