GARDA

Contract: 260-202401

## ATM SERVICE AGREEMENT

This Agreement is made on March 1, 2013 by and between Garda CL Southeast, Inc. ("CARRIER") and Plaquemine Bank and Trust ("CUSTOMER") whose address is PO Box 626, Plaquemine, LA 70765.

### BACKGROUND

Customer owns and operates a number of automated teller machines ("ATMs") located at sites as set forth on the Addendum annexed herein. These ATMs normally operate twenty-four (24) hours a day, seven (7) days a week. From time to time, these ATMs require emergency service, and routinely require settlements and replenishments of cash and other products of value. Carrier offers such emergency and routine services and Customer desires to purchase such services from Carrier.

NOW, THEREFORE in consideration of the mutual promises herein contained and intending to be legally bound hereby, the parties agree as follows:

**SECTION I. Scope of Services.**

Carrier shall perform such ATM services ("Service"), as designated by Customer and further described on the ATM Service Addendum ("Service Addendum"), attached hereto and made an integral part hereof. This Agreement is for cash in cassettes only – no stamps or other media is included in Services, unless otherwise set forth.

A. On-Route ATM Service Hours Except where noted otherwise on the Addendum, on-route ATM service hours observed by Carrier will be from 8:00 a.m. to 5:00 p.m., Monday through Friday. Holiday hours are not included.

B. Limits of Service Carrier agrees to be in attendance for dual custody purposes when requested for an additional fee at Customer's ATMs during established service hours when machine vendor service is required and is being performed. It is expressly understood and acknowledged that Carrier's attendance for dual custody purposes does not constitute security guard or escort services under any circumstances, and Carrier shall have no such obligations or duties associated therewith.

C. Settlements Carrier will perform ATM settlements on the days and within the time frames mutually agreed upon by Carrier and the Customer, as set forth in the attached Service Addendum. Carrier agrees to assign an Account Manager to Customer. This person will act as a liaison between the Customer and Carrier for the management of operational issues.

**SECTION II. Fee.**

Customer agrees to pay Carrier the fees set forth in the Service Addendum for the Services set forth in Section I above. Carrier will use its best efforts to provide billing to Customer for Services rendered by the fifteenth(15th) of the month following the month in which the Service was rendered. Customer agrees to pay Carrier for the Services, the sum set forth in the Service Addendum, per month plus all additional charges associated with any special Service requests. Payment is due net 30 days from the date of any invoice. Customer understands and agrees that Carrier reserves the right to charge the lesser of one and a half percent (1.5%) or the highest rate permitted by applicable



EXHIBIT "B"

law, per month or fraction thereof, finance charge on all balances that are not paid within thirty (30) days of the date of invoice. Customer further understands and agrees that Carrier shall not be responsible to issue credits for erroneous billings that are more than ninety (90) days old as of the date the credit is requested.

**SECTION III. ATM(s) To Be Serviced.**

Carrier shall provide its Services to Customer for the ATMs at the locations and for the Services listed on the Service Addendum. Customer additionally agrees that Carrier shall be the sole service replenisher provider within the geographic segments defined by the ATMs listed on said Addendum. Any shared maintenance services shall be subject to and performed in accordance with a written shared liability agreement signed by Carrier, Customer and the maintenance service provider.

**SECTION IV. Term.**

Services provided under this Agreement shall commence on March 1, 2013 and shall continue for a period up to and including March 1, 2016 and shall continue thereafter on a yearly basis until terminated by either party upon ninety (90) days prior written notice to the other. If either Carrier or Customer materially and repeatedly defaults in the performance of any of its duties or obligations hereunder, and said default is not substantially cured within thirty (30) days after written notice of the default is given to the defaulting party, then the non-defaulting party may, by giving written notice thereof to the defaulting party, terminate this Agreement as of the date specified in such notice of termination; provided however, that if such default cannot be reasonably cured within said thirty (30) days, so long as the defaulting party, within thirty (30) days, provides the non-breaching party with a written reasonable plan and completion date for curing such default and diligently proceeds to substantially cure the default in accordance with such plan and by such completion date, the non-breaching party shall not be entitled to terminate this Agreement under this section.

**SECTION V. ATM Supplies.**

Customer agrees to provide all supplies necessary for the proper operation of the Customer's ATMs, and for the convenience of the Customer's customers. Carrier agrees to contact Customer's supplier and order supplies on an as needed basis.

A. Kaba-Mas Lock Unless otherwise expressly agreed upon by the parties, all ATMs serviced by Carrier shall be equipped and installed with a Kaba-Mas locking system and software at Customer's expense. Each party agrees to properly maintain and operate the locking system and associated dispatch software in accordance with the instructions and recommendations of the manufacturer, and will maintain all audit records and reports generated by the software for no longer than two (2) years from the date of settlement.

**SECTION VI. Currency Needs.**

Customer agrees to maintain an adequate supply of currency in the proper denominations in inventory at the Carrier facility for the purpose of replenishing the Customer's ATMs. Carrier, at the Customer's direction, will procure currency in sealed packages/containers from the Federal Reserve and/or financial institution acting as the Customer's Vault Facility. Carrier will strap count this currency at the Carrier facility under Dual Custody prior to placement of the currency into the Customer's ATMs. "Dual Custody" shall be defined as strap counting currency, as set forth above, (i) under security camera, or (ii) in the presence of other Carrier personnel. Absent conclusive proof of tampering or opening of the sealed packages or containers by Carrier prior to the verification process under Dual Custody, Customer agrees to honor differences found by Carrier during the initial

GARDA

verification. Carrier will report to Customer of any discrepancy at the time it is discovered or the next business day.

**SECTION VII. Audits.**

Subject to Customer's compliance with Carrier's security procedures, Carrier agrees to permit authorized Customer personnel to visit the Carrier facility during normal business hours, or as otherwise mutually agreed upon, solely to perform audits of the Customer's currency inventory held by Carrier. Furthermore, Carrier agrees to permit prearranged external audits of currency to be performed by qualified certified public accountants chosen by and paid for solely by the Customer. Carrier further agrees to cooperate with currency audit procedures reasonably deemed necessary by the Customer, for example, periodic attendance at an ATM during settlement. Customer agrees to conduct such audits in a manner so as to minimize any interference with Carrier's operations.

**SECTION VIII. Procedures.**

Carrier agrees to follow Customer's reasonable standard written operating procedures required to enter and exit Customer's ATM locations, including making any required phone calls and completing any Customer service logs, provided that Customer's procedures are not in conflict with Carrier's security procedures and will not materially increase the security risks to people and property. Carrier shall promptly notify Customer of any conflict in security procedures.

**SECTION IX. ATM Access.**

Carrier will maintain the combination and keys to Customer's ATMs and agrees to keep these combinations strictly confidential and be responsible for the keys while in use during the performance of services described herein, and while in Carrier's possession.

**SECTION X. Robbery.**

Loss as a result of robbery at an ATM while Carrier is in attendance at such ATM performing the Services as described herein, will be the responsibility of Carrier.

**SECTION XI. Burglary.**

The contents of the Customer's ATMs while Carrier is not in attendance and being serviced by Carrier will be the responsibility of the Customer in the event of an ATM break-in or any other unauthorized tampering with the ATM. However, if upon investigation it is found that Carrier was negligent in its duties to secure the premises by locks, alarms and any other security devices provided by Customer at an ATM site where an ATM break-in or unauthorized tampering occurred, then the loss as a direct result of same will be the responsibility of Carrier. Customer agrees to turn over all keys and other access to the ATMs to Carrier to insure no compromise by Customer employees. Customer shall be solely responsible for determining the frequency of key and/or combination changes to the ATMs, which shall be at Customer's sole cost and expense.

**SECTION XII. In Transit**

Except as otherwise herein limited Carrier agrees to assume liability for any loss, theft or damage to Customer ATM cash or other negotiable instruments from the time of actual receipt by Carrier until such time as it is delivered to the Customer or installed in Customer's designated ATM.

A. **Check Reconstruction.** Customer will use diligent efforts, consistent with internal formalized procedures of Customer, to reconstruct the checks that constitute a part of the loss. Such reconstruction effort may include and request affected customer(s) of Customer to provide

GARDA

applicable data from any electronic or other form of electronic data capture or point of sale system. Carrier's sole liability shall be the payment to Customer of: (a) reasonable costs necessary to Reconstruct the checks plus any necessary costs because of stop payment procedures; (b) the face value of checks that cannot be Reconstructed, provided adequate proof of the value thereof is presented to Carrier, except those checks which would not be collectable at the time of loss. The maximum liability of Carrier for the checks shall in no event exceed the maximum shipment liability limit set forth in Section 14. Customer agrees that Carrier and Carrier's insurance company shall not be liable for damages directly or proximately flowing from Customer's breach of this provision. Upon payment of a loss pursuant to this Agreement, Carrier or its insurance company shall be subrogated to all Customer's rights and remedies of recovery therefor. The Customer shall assign to the Carrier, Customer's right to receive payment under any check(s) for which Carrier has reimbursed Customer and Customer shall execute any document necessary or reasonably desirable to perfect and accomplish such assignment. "Reconstruction", "Reconstruct" and "Reconstructed" shall mean to identify checks to the extent of determining the face amount of said checks, the ABA routing and transit number of the drawee bank, customer account number at drawee bank and the identity of the maker of each.

**SECTION XIII. Currency Loading.**

Carrier agrees to assume responsibility for shortages that are the direct result of Carrier employees putting different denominations of currency or other products of value in the wrong canisters. Customer will use diligent efforts, consistent with their internal formalized procedures to reconstruct the activity and debit as appropriate the affected accounts that constitute the loss.

**SECTION XIV. Currency Shortages.**

Shortages in an ATM detected during any emergency or routine Service described herein will be the responsibility of Carrier unless after investigation the shortage is found to be the result of any of the following:

A. An ATM hardware or software malfunction;

B. Mistaken or fraudulent instructions electronically transmitted to an ATM by any person who is other than an employee of Carrier;

C. Access to an ATM by any other person under contract or otherwise for maintenance or other reason in connection with servicing an ATM and having access to the ATM and ATM vault, independent of Carrier access; or

D. The result of burglary as set forth in Section XI above.

Customer and Carrier agree to perform a thorough investigation, the conduct of which will be agreed upon by both parties. The results of each party's investigation will be made available to the other party. If, after a thorough investigation, it is determined that the shortage has not been caused by one of the above such reasons, then, subject to applicable law, the employees of Carrier who have serviced such ATM shall cooperate fully with such investigation (including submission to a polygraph test or other scientific test to the extent permitted by law). In the event that an employee of Carrier is found liable for a loss of Customer funds, Carrier shall be responsible for the amount of actual cash shortage caused by the misconduct of the employee. The maximum liability for losses under the provisions of this Agreement, including check Reconstruction, shall not exceed per incident specified in the ATM Service Addendum, attached hereto and made part hereof ("Maximum Liability

GARDA

Limit per Incident"). In no event, however, shall Carrier be liable for any incidental, consequential or punitive damages arising from loss of or damage to property. Carrier does not assume liability for shortages of currency totaling $100.00 or less per ATM, per settlement occurrence. Carrier will document and report all overages and shortages to Customer. In the event frequent recurring shortages of $100.00 or less are noticed, an investigation shall be conducted and diligently pursued to completion.

Customer and Carrier acknowledge and agree that prompt and timely notice of shortages is essential for minimizing losses. Customer agrees to notify Carrier in writing of any shortages within 10 days of the date the shortage occurred or the date Carrier reports settlement to Customer, whichever is later ("Loss Date"). In addition, Customer will submit a written claim to Carrier of any unresolved shortage within 45 days of the Loss Date. Such claim letter shall include all supporting documentation or other demonstrative evidence, including all information and documentation showing any overages during the period in question. In the event Customer is not able to meet this obligation due to computer or system error, Customer will notify Carrier and the parties shall mutually agree on an appropriate extension of time. Customer will agree to an appropriate extension of time required by Carrier to complete a thorough and adequate investigation regarding claim letters.

Within sixty (60) days after Carrier receives Customer's claim letter in the manner set forth above, Carrier shall either (1) make full payment of the loss with respect to the property for which Carrier is responsible for under this Agreement, (2) deny Customer's claim in writing and provide the basis as to why Carrier is not responsible for or otherwise disputes payment of the loss, or (3) give Customer written notice that Carrier requires additional time to complete the investigation.

**SECTION XV. Insurance and Claim for a Loss.**

Carrier agrees that at all times during the term of this Agreement it shall maintain an All Risk insurance policy with a minimum limit of as specified in the ATM Service Addendum, from a financially sound and reputable insurance company which will insure the liabilities for currency assumed by Carrier hereunder. Customer agrees to notify Carrier verbally of any claim for a loss or any notice of discrepancy that could lead to claim for a loss within twenty-four (24) hours after such Loss or such notice of discrepancy is discovered or should have been discovered in the exercise of due care, and, Customer agrees to follow up said oral notification with written notification as expeditiously as possible thereafter, and in any event, within forty-five days (45) after such Loss Date, as provided in Section 14 of this Agreement. Customer further agrees to furnish proof of loss in a form reasonably satisfactory to Carrier or its insurer and to promptly and diligently assist Carrier or its insurer in all ways pertaining to recovery of said loss. Upon payment of a Loss hereunder, Carrier or its insurance company shall be subrogated to all Customer's rights and remedies of recovery therefor. Without limiting any other provisions contained herein, Customer and Carrier agree that Carrier shall not be liable in any action brought to enforce a claim unless such action is brought within two (2) years after the Loss Date.

**SECTION XVI. Limits of Liability.**

It is agreed that Carrier shall not be liable for non-performance or delays or loss or damage caused by or resulting from: (a) hostile or war-like action in time of peace or war, including action in hindering, combating, or defending against an actual, impending or expected attack, (1) by any Government or sovereign power (de jure or de facto), or by any authority maintaining or using military, naval or air force, or (2) by Military, Naval, and Air Forces; or (3) by any agent of any such

GARDA

Government, power, authority or forces; (b) any weapon of war employing an atomic fission or radioactive force whether in time of peace or war; ( c ) insurrection, rebellion, revolution, civil war, usurped power, or action taken by governmental authority in hindering, combating or defending against such an occurrence, or confiscation by order of any government or public authority; (d) nuclear reaction or nuclear radiation or radioactive contamination, all whether controlled or uncontrolled and whether such loss be direct or indirect, proximate or remote, or be in whole or in part caused by, contributed to, or aggravated by the peril(s) against which Carrier assumes liability in this Agreement.

Carrier shall not be liable for non-performance of Services, shortages, losses, damages or delays not caused by its fault or negligence, nor for non-performance or delays caused by events beyond the reasonable control of Carrier, including, without limitation, strikes, or other labor disturbances, riots, war, insurrection, authority of law, acts of God, of the public enemy, weather, road closures, general transportation delays, floods, or storms. The parties understand and agree that Carrier shall not be liable for any incidental, consequential, punitive or exemplary damages arising from any loss of property, including without limitation, cash, checks or negotiable instruments.

**SECTION XVII. Arbitration.**

Any controversy, claim or dispute arising out of or relating to this Agreement, the interpretation thereof, or the breach thereof, shall be submitted to mediation. If the parties cannot agree upon a mediator, than either party may request JAMS/Endispute to appoint a mediator. If the mediation is unsuccessful or if the parties agree in writing to forego mediation, the matter shall be submitted to binding arbitration in Los Angeles County, California, or as otherwise mutually agreed upon, by the decision of an arbitrator before and in accordance with the rules of the JAMS/Endispute, except as modified herein, and judgment upon the award rendered by the arbitrator may be entered in any court having jurisdiction thereof. The arbitration shall apply the law of the State of California. Discovery shall be allowed and shall be governed by the discovery rules of the California Code of Civil Procedure for municipal court cases except that there shall be no depositions and a combined aggregate of a maximum of 35 of any combination of interrogatories, requests for production of documents and requests for admissions including all sub parts. The arbitrator shall have the authority to make appropriate discovery rulings and orders. The decision or award of the arbitrator shall be supported by written findings of fact and conclusions of law. The decision of the Arbitrator shall be final and binding. Either party may file an action solely for the purpose of receiving an order or injunction to maintain the status quo ante until an arbitration proceeding may be held. Should arbitration action or action by any attorney be taken or suit be brought to enforce the provisions of this Agreement, the prevailing party shall be entitled to attorneys' fees, the cost of suit and actual court and/or arbitration costs whether or not such suit shall proceed to trial or arbitration.

**SECTION XVIII. Section Headings.**

The section headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.

**SECTION XIX. Governing Law.**

This Agreement shall be controlled, construed and enforced in accordance with the laws of the State of California.

GARDA

**SECTION XX. Waiver.**

The waiver by one party of the performance of any covenant, condition or promise shall not invalidate this Agreement nor shall it be considered a waiver by such party of any other covenant, condition or promise hereunder. The exercise of any remedy provided by law in the provisions of this Agreement shall not exclude other available remedies unless they are expressly excluded.

**SECTION XXI. Confidentiality.** The parties as part of the performances hereunder, during the term of this Agreement, will have access to and become acquainted with various trade secrets including, without limitation, processes, programs, systems, software, compilations of information, records, specifications, financial information, marketing plans and customer lists which are owned by a party and which are regularly used in the operation of the business of a party ("Confidential Information") and data belong to clients of CUSTOMER, including non-public consumer information. Neither party shall disclose any of the aforesaid Confidential Information, directly or indirectly, or use them in any way either during the term of this Agreement or at any time thereafter, except as required in the course of its services under this Agreement. All Confidential Information shall remain the exclusive property of the disclosing party or its customers and clients and shall not used or reproduced except in the sole interest of the disclosing party and with its prior consent and shall be immediately returned or destroyed upon request of the disclosing party or at the termination of services hereunder.

**SECTION XXII. Entire Agreement.**

This Agreement, including the Service Addendum and all attachments and schedules, embodies the entire Agreement and understanding between the parties and supersedes all prior and contemporaneous agreements and understandings; inducements or conditions expressed or implied oral or written, relating to the subject matter hereof except as contained herein. Moreover, this Agreement may not be modified, amended, waived, or discharged except by an instrument in writing executed by the party against whom enforcement of such modification, amendment, waiver or discharge is sought.

IN WITNESS WHEREOF, the parties hereto have executed this contract as of the day and year written below.

| **Carrier** | **Customer** |
|---|---|
| Garda CL Southeast, Inc. | Plaquemine Bank and Trust |
| By: David Rugani (Signature) | By: Rhett Vaughn (Signature) |
| David Rugani (Printed Name) | Rhett Vaughn (Printed Name) |
| Title: Controller | Title: VP of Operations |



Contract: 260-202401

GARDA

## ATM SERVICE ADDENDUM

| FOR OFFICE USE ONLY | |
|---|---|
| Customer Account: Plaquemine Bank and Trust | Contract: 260-202401 |

This ATM Service Addendum ("Addendum"), entered into by and between Garda CL Southeast, Inc.. ("Carrier") and Plaquemine Bank and Trust ("Customer"), dated March 7, 2013 amends and is incorporated into the ATM Service Agreement between Carrier and Customer, dated March 1, 2013 ("Agreement") by adding or amending the following customer rates, schedules, lists, liabilities, days, term and/or terms.

**WITNESSETH**

**WHEREAS**, Carrier is a provider of ATM services, as defined below ("Services") and desires to perform such Services for Customer, subject to the terms of the Agreement and this Addendum; and

**WHEREAS**, Customer desires to engage Carrier to perform said Services as set forth herein, subject to the terms of the Agreement, this Addendum and any rider attached thereto; and

**WHEREAS**, All capitalized terms not specifically defined herein shall have the same meaning assigned to them in the Agreement; and

**NOW THEREFORE**, in consideration of the mutual promises and covenants contained herein, the parties agree as follows:

**SECTION I. Replenishment Service.**

Customer elects, and Carrier shall perform, such ATM services ("Services") as designated by Customer below in accordance with the terms of the Agreement (check one):

| ☐ Cassette Exchange Service | ☐ Currency Exchange Service |
|---|---|
| Carrier, at Customer's direction, shall, under Dual Control, pre-load the ATM cassette(s) with the amount of currency as designated by Customer, seal the ATM cassette(s) and transport the cassette(s) to the ATM designated by Customer below. Carrier shall open the ATM vault(s), and remove and replace the sealed, spent ATM cassette(s) with the sealed, pre-loaded ATM cassette(s). Carrier shall then close and secure the ATM(s), and transport the removed sealed ATM cassette(s) back to Carrier's facility where Carrier shall then, under Dual Control, break the seal of the removed ATM cassette(s), and extract, verify and seal the residual currency in tamper-resistant bags. Carrier shall then report such residual currency amount back to Customer. | Carrier, at Customer's direction, shall, under Dual Control, pre-load the amount of currency as designated by Customer in sealed, tamper-resistant bag(s), and transport said bag(s) to the ATM(s) designated by Customer below. Carrier shall open the ATM vault(s) and remove the sealed, existing ATM cassette(s). Carrier shall extract the residual currency in the ATM cassette and place said currency in a sealed bag. Carrier shall open the pre-loaded sealed bag(s) and place the contents thereof in the empty ATM cassette(s). Carrier shall then seal the ATM cassette(s), insert same into the ATM vault(s), and close and secure the ATM. Carrier shall transport the sealed bag of residual currency back to Carrier's facility where Carrier shall then, under Dual Control, open the sealed bag, extract and verify the residual currency, and place such currency in a sealed bag. Carrier shall report such residual currency amount back to Customer. |

GARDA

## SECTION II. Residual Currency Handling.

After the residual currency has been extracted, verified and sealed in tamper-resistant bags, Carrier shall, at Customer's direction, perform the following residual currency handling service (check one):

| Carrier Transport | Stockpile at Carrier's | Tender for Pickup |
|---|---|---|
| Transport the sealed bags of residual currency to Customer's designated depository or cash processor, pursuant to the terms of an armored car service agreement between Carrier and Customer; or | Stockpile the sealed bags of residual currency at Carrier's facility for purposes of pre-loading ATM cassettes in accordance with the terms of this Agreement and Addendum; or | Tender the sealed bags of residual currency at Carrier's facility to Customer's designated third party armored courier servicer. |

## SECTION III. Settlement and Reporting.

Following extraction and verification of residual currency amounts in accordance with the terms of the Agreement and this Addendum, Carrier shall settle the total residual currency amount of the spent ATM cassette(s) with the tape record of the ATM unit from which the cassettes were extracted. Such settlement shall be performed by Carrier within ________ business day(s) following Carrier's receipt of the residual currency. Carrier shall provide Customer or Customer's designated agent with a written report of such settlement by facsimile transmission or such other mutually agreed upon method by the following banking day following settlement.

## SECTION IV. Holidays.

Customer and Carrier agree that Services shall, unless otherwise agreed, exclude the holidays set forth below for which a Holiday Rate, priced per event, shall apply:

(1) New Years Day
(2) Presidents Day
(3) Memorial Day
(4) Martin Luther King Day
(5) Independence Day
(6) Labor Day
(7) Columbus Day (except NV)
(8) Veteran's Day
(9) Thanksgiving Day
(10) Christmas Day
(11) Family Day (NV Only)
(12) Admission Day (NV Only)

It is understood and agreed that, to the extent consistent with the Federal Reserve holiday schedule, if the holiday falls on a Saturday then Saturday is the holiday not the day before, Friday, or the following Monday.

## SECTION V. ATM Sites and Replenishment Schedule

*ATM Locations Replenishment Schedule*
(Site Address) (Days of Week)

| **Service Location | City | State | Sunday | Monday | Tuesday | Wednesday | Thursday | Friday | Saturday |
|---|---|---|---|---|---|---|---|---|---|
| Choctaw Mobile Home Park | Plaquemine | LA | N | N | N | N | Y | N | N |

GARDA

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Dickie's | Addis | LA | N | N | N | N | Y | N | N |
| V & C Grocery | Plaquemine | LA | N | N | N | N | Y | N | N |
| Court House | Plaquemine | LA | N | N | N | N | Y | N | N |

(** Flagged for GARDA CL Internal purposes only.)

## SECTION VI. ATM Pricing

Customer agrees to pay the rates and fees provided herein. Rates for Service may be increased by surcharges due to material increases in fuel and insurance costs. Fees are based on and contingent upon Customer's ATMs using electronic journal devices and card readers commonly known as "dip readers" or "swipe readers"

The rates contained in this Schedule A shall remain the same for the first year of the initial term of the Agreement. Upon entering years two and three, a two percent (2%) increase will be applied each year.

| Status | **Effective Date | **Service Location | **Address | City | State | **Product | **Monthly Price | Item Allowance | Liability Limit |
|---|---|---|---|---|---|---|---|---|---|
| Active | 1/1/2013 | Choctaw Mobile Home Park | 59605 Hwy. 1148 | Plaquemine | LA | ATM Service | $150.00 | | $9,999,999.00 |
| Active | 1/1/2013 | Dickie's | 7280 Hwy. 1 South | Addis | LA | ATM Service | $150.00 | | $9,999,999.00 |
| Active | 1/1/2013 | V & C Grocery | 58720 Belleview Road | Plaquemine | LA | ATM Service | $150.00 | | $9,999,999.00 |
| Active | 1/1/2013 | Court House | 58050 Meriam St | Plaquemine | LA | ATM Service | $150.00 | | $9,999,999.00 |

(** Flagged for GARDA CL Internal purposes only.)

The following rate schedule applies to the service locations listed above:

| **Product | | |
|---|---|---|
| ATM Service | | |
| Description | Price ($) | Unit of Measure |
| ATM REPLENISHMENT $ | 70 | Trip |
| MAINTENANCE STANDBY | 75 | Hour |
| EMERGENCY CASH REPLENISHMENT $ | 150 | Hour |
| | | |
| **Product | | |
| ATM Service | | |
| Description | Price ($) | Unit of Measure |
| ATM REPLENISHMENT $ | 70 | Trip |
| MAINTENANCE STANDBY | 75 | Hour |
| EMERGENCY CASH REPLENISHMENT $ | 150 | Hour |

(** Flagged for GARDA CL Internal purposes only.)

GARDA

## Custom Fuel Surcharge Index and Methodology

Our fuel surcharge calculation method is based on the 3 week rolling average of the U. S. Energy Information Administration (eia.doe.gov). The Department of Energy website is updated every Tuesday and the National average is the benchmark used.

Each month, the 3-week rolling average will be recalculated and the surcharge will be adjusted up or down based on the following matrix:

For any 3-week U.S. National Average Diesel Fuel price over $3.50 add an additional 1% for every $0.25 per gallon increase.

| Per Gallon Price | Surcharge |
|---|---|
| Below- $3.50 | 0% |
| $3.501-$3.75 | 1% |
| $3.751-$4.00 | 2% |
| $4.001-$4.25 | 3% |
| $4.251-$4.50 | 4% |
| $4.501-$4.75 | 5% |
| $4.751-$5.00 | 6% |

**IN WITNESS WHEREOF, CARRIER and CUSTOMER** have executed this effective as of the date set forth above.

**CARRIER**
Garda CL Southeast, Inc.

By: David Rugani
(Signature)

David Rugani
(Printed Name)

Title: Controller

**CUSTOMER**
Plaquemine Bank and Trust

By: Rhett Vaughn
(Signature)

Rhett Vaughn
(Printed Name)

Title: VP of Operations